Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL III

| GLENDALY HERNÁNDEZ ACOSTA **Apelada** V. ÁNGELES TORRES SÁNCHEZ; ANTONIO ARRIETA SEPÚLVEDA **Apelante** | TA2026AP00176 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Civil. Núm.<br><br>GB2022CV00066<br><br>Sobre: Incumplimiento e Interferencia de Contrato; Contrato en Daño de Tercero; Daños y Perjuicios Incumplimiento de Contrato |
|---|---|---|

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Rivera Torres y el Juez Marrero Guerrero

**Hernández Sánchez, Juez Ponente**

**SENTENCIA**

En San Juan, Puerto Rico, a 18 de junio de 2026.

El 18 de febrero de 2026, la Lcda. Ángeles Torres Sánchez (licenciada Torres), el Sr. Antonio Arrieta Sepúlveda (señor Arrieta) y Arrieta Realty, LLC (Arrieta Realty) (en conjunto, los apelantes), comparecieron ante nos mediante *Apelación* y solicitaron la revisión de una *Sentencia* que se dictó el 22 de diciembre de 2025 y se notificó el 30 de diciembre de 2025 por el Tribunal de Primera Instancia, Sala Superior de Bayamón (TPI). Mediante el aludido dictamen, el TPI declaró Ha Lugar la Demanda presentada por la Sra. Glendaly Hernández Acosta (señora Hernández o la apelada). En consecuencia, le ordenó a la licenciada Torres, al señor Arrieta y Arrieta Realty a pagar solidariamente las siguientes sumas: $82,174.00 por los daños causados a la señora Hernández, $50,000.00 por lucro cesante y $5,000.00 por las costas y honorarios de abogado.

Por los fundamentos que expondremos a continuación, se modifica la *Sentencia* apelada para eliminar la partida de $50,000.00 concedida por concepto de lucro cesante y reducir la partida de daños a la suma de $10,000.00 por concepto de daños morales y angustias mentales. Así modificada, se confirma la *Sentencia* apelada.

**I.**

El 4 de febrero de 2022, la señora Hernández presentó una *Demanda Enmendada* sobre daños, incumplimiento contractual e interferencia torticera en contra de los apelantes y la Sra. Maricarmen Curet Miranda (señora Curet).[1] Allí, alegó que, el 14 de diciembre de 2021, suscribió un contrato de opción de compraventa intitulado "Contrato de Compraventa" (Contrato) con la licenciada Torres. Sostuvo que, mediante el referido acuerdo, esta última se obligó a venderle una propiedad inmueble sita en The Village At Suchville #1 San Miguel Guaynabo (Propiedad) por el valor de $275,000.00. Esbozó que, según lo pactado, ella le entregaría a la licenciada Torres la suma de $7,000.00 en concepto de depósito y que el monto restante, a saber, $268,000.00, se satisfaría mediante cheques de gerente en o antes del 28 de enero de 2022.

A tales efectos, indicó que le entregó a la licenciada Torres, por conducto del señor Arrieta, un cheque por la suma de $7,000.00. Expuso que, conforme a lo acordado, una vez sometida la opción, las partes debían realizar todas las gestiones pertinentes para que el cierre de la compraventa se pudiera llevar a cabo dentro del término de cuarenta y cinco (45) días calendarios, lo cual vencía el 28 de enero de 2022. A pesar de lo anterior, esbozó que la Propiedad se vendió el 29 de diciembre de 2021 a la señora Curet

---

[1] *Véase*, Entrada Núm. 5, SUMAC TPI.

sin su consentimiento ni su renuncia a la opción de adquirir el inmueble.

Como consecuencia de lo antes mencionado, manifestó que, el señor Arrieta, Arrieta Realty y la señora Curet interfirieron ilícitamente con el contrato que constituyó con la licenciada Torres con pleno conocimiento. Esgrimió que, tras el incumplimiento contractual se vio a la merced de quedarse sin un techo ya que no era propietaria de ningún bien inmueble y no había renovado su contrato de arrendamiento confiando que iba adquirir la Propiedad. Señaló que, esto le había causado tristeza, angustia y preocupación provocando noches de desvelo, así como un estado de "shock", que la sumió en una depresión que la ha obligado a buscar ayuda. A su vez, esbozó que había tenido en incurrir en costos de vivienda actuales mayores a los gastos que hubiera tenido de haberse cumplido el Contrato.

Por tal razón, solicitó distintas partidas por concepto de incumplimiento e interferencia de contrato, contrato en daño de tercero y daños y perjuicios por incumplimiento contractual. Además, reclamó el pago de las costas y una suma de $10,000.00 por concepto de honorarios de abogado.

En respuesta, el 24 de marzo de 2022, los apelantes presentaron una *Moción de Solicitud de Desestimación.*[2] En esencia, manifestaron que el Contrato se resolvió mediante las actuaciones de la apelada cuando esta aceptó y depositó en su cuenta los $7,000.00 dados en calidad de depósito. Por lo que, arguyeron que la causa de acción instada dejó de exponer una reclamación que justificara la concesión de un remedio y, en consecuencia, debía ser desestimada. En la alternativa, de no ser acogida la solicitud, presentaron una *Contestación a Demanda* donde reiteraron que el

---

[2] *Véase*, Entrada Núm. 20, SUMAC TPI.

Contrato había sido resuelto. Por lo que, señalaron que no existía incumplimiento de obligación alguna ni existía acción u omisión culposa o negligente de la cual se pudiese responder por daños.

Posteriormente, el 22 de febrero de 2023, la señora Hernández y la señora Curet presentaron una *Moción de Desistimiento Voluntario con perjuicio de la reclamación contra la Co-Demandada Maricarmen Curet* donde se solicitó autorización para desistir con perjuicio de la acción de epígrafe en contra de la señora Curet.[3] Atendida la moción, el TPI la declaró Con Lugar mediante una *Sentencia Parcial* que emitió el 22 de febrero de 2023 y notificó el 24 de febrero de 2023.[4]

Después de varios incidentes innecesarios pormenorizar, el 30 de junio de 2023, la señora Hernández presento una *Moción de Sentencia Sumaria.*[5] En primer lugar, enumeró treinta y dos (32) hechos que, a su juicio, no estaban en controversia. Luego, argumentó que, conforme a estos hechos y el derecho aplicable, quedó establecido el incumplimiento de los apelantes con el contrato de opción. Particularmente, indicó que no existía fundamento alguno para que después de haberse llevado a cabo el referido acuerdo y sin previa notificación, los apelantes vendieran la Propiedad a un tercero. Así, enfatizó que cumplió con sus obligaciones pues desde noviembre de 2021, ya tenía cotizaciones con la institución financiera de su preferencia, inició el proceso con el banco y comunicó que el préstamo se había originado dentro del término requerido por el Contrato.

Pese a lo expuesto, adujo que los apelantes hicieron caso omiso a sus obligaciones y que fueron estos los que dieron por terminado el acuerdo de modo automático y unilateral. Incluso,

---

[3] *Véase*, Entrada Núm. 89, SUMAC TPI.
[4] *Véase*, Entrada Núm. 90, SUMAC TPI.
[5] *Véase*, Entrada Núm. 95, SUMAC TPI.

señaló que mientras le estaba dando seguimiento al trámite del inmueble opcionado, el señor Arrieta opcionó la Propiedad a la señora Curet el 22 de diciembre de 2021. Por tal razón, solicitó que se declarara sentencia sumaria a su favor y se ordenara el pago de $132,174.00 por los daños sufridos a causa del incumplimiento contractual.

En oposición, el 25 de septiembre de 2023, la licenciada Torres presentó su *Moción en Oposición a Solicitud de Sentencia Sumaria.*[6] Allí, esbozó que la solicitud de sentencia sumaria no cumplió con los requisitos de fondo y forma conforme a la Regla 36.3 (a) de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3 (a). Además, alegó que existían controversias medulares que impedían la adjudicación de la reclamación sumariamente.

Por otra parte, expuso que la resolución del contrato de compraventa fue confirmada por la apelada mediante la devolución y aceptación de los $7,000.00 dado en calidad de depósito. Por lo que, arguyó que se dio la figura de pago y aceptación en finiquito. En este sentido, razonó que la causa de acción instada dejó de exponer una reclamación que justificara la concesión de un remedio y, en consecuencia, debía ser desestimada.

Evaluados los escritos de las partes, el 13 de febrero de 2024, el TPI emitió y notificó una *Resolución.*[7] Mediante esta, declaró No Ha Lugar la solicitud de sentencia sumaria presentada por la señora Hernández y ordenó la continuación de los procedimientos. Inconforme, el 16 de febrero de 2024, la señora Hernández presentó una *Moción de Reconsideración Parcial.*[8] Por su parte, el 26 de febrero de 2024, la licenciada Torres presentó una *Moción Oposición a Solicitud de Reconsideración.*[9]

---

[6] *Véase,* Entrada Núm. 120, SUMAC TPI.
[7] *Véase,* Entrada Núm. 136, SUMAC TPI.
[8] *Véase,* Entrada Núm. 142, SUMAC TPI.
[9] *Véase,* Entrada Núm. 143, SUMAC TPI.

Así las cosas, el 26 de agosto de 2024, el TPI emitió una *Sentencia* que se notificó el 28 de agosto de 2024.[10] Mediante el aludido dictamen, el TPI reconsideró su previa determinación. Fundamentó que, era un hecho confirmado y no refutado que la señora Hernández aceptó y depositó en su cuenta los $7,000.00 dados en calidad de depósito por el contrato de opción que fueron devueltos por el señor Arrieta. A tales efectos, juzgó que el referido acuerdo había sido resuelto por lo que no había una reclamación que justificara la concesión de un remedio. En virtud de ello, declaró Ha Lugar la solicitud de desestimación de los apelantes y, en consecuencia, desestimó la demanda de epígrafe.

En desacuerdo con el dictamen, el 18 de septiembre de 2024, la señora Hernández presentó ante este Tribunal de Apelaciones (TA) un recurso de apelación bajo el alfanumérico **KLAN202400852**.[11] Atendido el recurso, el 28 de octubre de 2024, un panel hermano dictó una *Sentencia*.[12] En esencia, determinó que no estaban presentes los criterios ni los requisitos para concluir que se realizó un acuerdo transaccional mediante un pago en finiquito en el caso de autos. Ante ello, concluyó que el TPI incidió al así determinarlo, por lo que revocó el dictamen apelado y ordenó la continuación de los procedimientos.

Así las cosas, el 18 de febrero de 2025, las partes de epígrafe presentaron un *Informe Preliminar de Conferencia con Antelación a Juicio*.[13] Allí, la señora Hernández reiteró que, ante el incumplimiento de contrato de opción a compraventa por los actos culposos de los apelantes, estos tenían un deber de restituir solidariamente el valor de la perdida que sufrió (daño emergente) y la ganancia que dejó de obtener (lucro cesante).

---

[10] *Véase*, Entrada Núm. 147, SUMAC TPI.
[11] *Véase*, Entrada Núm. 148, SUMAC TPI.
[12] *Véase*, Entrada Núm. 157, SUMAC TPI.
[13] *Véase*, Entrada Núm. 164, SUMAC TPI.

A tales efectos, señaló que el valor de pérdida en que incurrió se estimaba en $82,174.00,[14] toda vez que esta era la suma adicional que se pagaría en intereses hipotecarios por una propiedad menor en valor. De otra parte, adujo que las propiedades en *The Village at Suchville* tenían como precio de venta $325,000.00. Así pues, manifestó que la Propiedad pactada fue de $275,000.00 por lo que la ganancia dejada de percibir era de $50,000.00.

En cambio, los apelantes arguyeron que el Contrato se resolvió mediante la devolución, aceptación y depósito de la suma de $7,000.00 dada como opción por la señora Hernández. Por lo cual, mantuvieron su posición de que en la presente controversia se configuró la figura de pago y aceptación en finiquito. De igual forma, esbozaron que, al momento de la compra de la propiedad, había una cantidad sustancial de propiedades en venta en el mismo lugar y que la apelada hizo nada. Además, plantearon que la señora Hernández no demostró como el alegado incumplimiento contractual afectó de manera desfavorable su patrimonio de una forma compensable.

Luego de varios incidentes procesales, el 1 de octubre de 2025 se celebró el juicio en su fondo. Surge de la *Minuta* que, durante la vista, el licenciado Colom auscultó que si la solicitud de *nonsuit* podía argumentarse oralmente o presentarse por escrito. Ante ello, el TPI concedió un término de veinte (20) días para la presentación de la referida solicitud, el cual vencería el 22 de octubre de 2025.

---

[14] Cabe precisar que, en la nota al calce núm. 1 del Informe Preliminar de Conferencia con Antelación a Juicio, la señora Hernández explicó cómo llegó a esta suma la cual trascribiremos a continuación:

> El precio pactado sobre la Propiedad en The Village at Suchville fue de $275,000.00 a pagarse en un plazo de 30 años al 3.25% de interés. Lo anterior significa que la Demandante iba a pagar $1,196.81 por 360 meses, para un total de $430,851.60. La diferencia entre el pago final de $430,851.60 y el precio pactado de la propiedad ($275,000.00) es de $155,851.60 en intereses.

> Por otro lado, debido a los cambios en el mercado hipotecario posteriores a enero de 2022, la Demandante terminó comprando una propiedad en Encantada (Aventura) por el precio de $180,000.00 a pagarse en un plazo de 30 años al 5.50% de interés. La pérdida calculada en valor es $82,174.00.

Asimismo, dispuso que, una vez presentada, la parte contraria contaría con un término igual de veinte (20) días para expresarse.[15]

Por ello, el 20 de octubre de 2025, los apelantes presentaron una *Moción desestimación por ausencia de prueba.*[16] Allí, esgrimieron que la señora Hernández falló en establecer, mediante la preponderancia de la prueba, los alegados daños sufridos. De igual forma, sostuvieron que la apelada no demostró que realmente se le haya aprobado un préstamo hipotecario, sino que solo presentó documentos genéricos preparatorios iniciales para ello. Así, esbozaron que la señora Hernández se limitó a solo mencionar que tenía una oferta de un prestamista hipotecario bajo unos parámetros, pero sin evidenciar la aprobación del *underwriter*. Por tanto, razonaron que no tenía un préstamo aprobado conforme a prueba y a derecho. En este sentido, reiteraron que la presente causa de acción no justificaba la concesión de un remedio y debería ser desestimada.

El 3 de noviembre de 2025, la señora Hernández presentó una *Oposición a Moción desestimación por alegada ausencia de prueba.*[17] En esencia, esbozó que no procedía la desestimación en virtud de la Regla 39.2(c) de Procedimiento Civil, 32 LPRA Ap. V, R.39.2(c) toda vez que en el caso de marras tanto el TPI como el TA determinaron que hubo incumplimiento contractual. Además, añadió que de la prueba quedó demostrado los daños que sufrió y la obligación de los apelantes en responder solidariamente por dicho incumplimiento.

Así las cosas, el 22 de diciembre de 2025, el TPI emitió una *Sentencia* que fue notificada el 30 de diciembre de 2025.[18] En primer lugar, realizó las siguientes determinaciones de hechos:

1. Entre el señor Arrieta y la señora Torres se suscribió un contrato verbal para la venta de la propiedad, sita en The Village At Suchville 1 (Propiedad). La señora

---

[15] *Véase,* Entrada Núm. 178, SUMAC TPI.
[16] *Véase* Entrada Núm. 179, SUMAC TPI.
[17] *Véase,* Entrada Núm. 181, SUMAC TPI.
[18] *Véase,* Entrada Núm. 185, SUMAC TPI.

Torres autorizó y puso en manos del realtor Arrieta todo lo que tenía que ver con la venta de la casa.

2. El acuerdo entre el señor Arrieta y la señora Torres consistía en la venta de la Propiedad, cobrar un tres por ciento (3%) de comisión, mercadearla y llevar clientes hasta el día del cierre.

3. El 25 de noviembre de 2021, el señor Arrieta se comunicó, por vía de mensaje de texto con la Srta. Glendaly Hernández, para mostrarle la Propiedad.

4. El 26 de noviembre de 2021, el señor Arrieta le envió a la Srta. Glendaly Hernández, por vía de mensaje de texto el contacto de un "mortgage", porque según él esa persona podía cerrarle su préstamo hipotecario bien rápido. Sin embargo, la Srta. Glendaly Hernández le dijo: "Te va a llamar el muchacho de Oriental. Le va a confirmar que yo cualifico. Y le envía la carta de precualificación tan pronto llegue. Se llama William". La contestación del señor Arrieta fue: "Okay".

5. Según reconoce el codemandado, señor Arrieta, desde el 26 de noviembre de 2021, la Srta. Glendaly Hernández ya le había comunicado que ella ya había iniciado la originación del préstamo y que estaba cualificada.

6. El 27 de noviembre de 2021, la Srta. Glendaly Hernández le envió otra comunicación al señor Arrieta, donde le informa que ya le enviaron los papeles para originar el préstamo.

7. El 10 de diciembre de 2021, la Srta. Glendaly Hernández suscribió el contrato de opción para comprar la Propiedad, en The Village At Suchville 1.

8. En el contrato, comparecieron la señora Torres (Parte Cedente o Vendedora) y la Srta. Glendaly Hernández.

9. El señor Arrieta, entonces presidente de Arrieta Realty, fungió como el agente corredor de bienes raíces de este negocio.

10. En el contrato de opción firmado por la Srta. Glendaly Hernández, el 10 de diciembre de 2021, se concedía a la parte compradora un término de setenta y dos (72) horas para iniciar el proceso en la institución financiera de su preferencia.

11. El 13 de diciembre de 2021, dentro de las setenta y dos (72) horas de firmar su contrato de opción, la Srta. Glendaly Hernández solicitó al señor Arrieta por mensaje de texto que le enviara el contrato firmado por la señora Torres, indicándole que: "Lo necesito para poder originar".

12. El 13 de diciembre de 2021, de igual manera, la Srta. Glendaly Hernández envió al originador del préstamo (William) los documentos de rigor para el trámite hipotecario.

13. Así las cosas, la señora Torres firmó el contrato de opción, el 14 de diciembre de 2021.

14. Reconoce el señor Arrieta, bajo juramento, que antes del 14 de diciembre de 2021, fue la Srta. Glendaly Hernández, quien dio seguimiento para cumplir con estos términos del contrato.

15. En virtud de la cláusula décima sexta del contrato de opción, la Srta. Glendaly Hernández tenía hasta el 17 de diciembre de 2021, para iniciar el proceso del préstamo en la institución financiera, ya que el contrato era válido, una vez se firmara por la señora Torres. No obstante, ya la Srta. Glendaly Hernández había iniciado el proceso.

16. Tras la entrega del contrato de opción firmado por la señora Torres, el préstamo de la Srta. Glendaly Hernández fue originado, el 17 de diciembre de 2021.

17. El 18 de diciembre de 2021, la Sra. Curet Miranda le envío una comunicación, por mensaje de texto al codemandado, señor Arrieta, con su correo electrónico, para que le hiciera llegar un acuerdo de opción para la propiedad en The Village At Suchville 1, para comprarla "cash".

18. El 19 de diciembre de 2021, la Srta. Glendaly Hernández le comunicó al señor Arrieta que deseaba poder visitar la propiedad para tomar unas medidas. Además, le informó que "la semana pasada [que es la semana del 14 de diciembre] se originó el préstamo".

19. El 22 de diciembre de 2021, la Srta. Glendaly Hernández le comunicó por mensaje de texto al codemandado, Arrieta, lo siguiente: "Saludos Arrieta, le llamaba para dejarle saber que voy a pasar a tomar unas medidas al "townhouse". El codemandado, Arrieta, no le dijo que su contrato se había cancelado, sino que le contestó: "Creo que la llave no está ahí".

20. El Sr. Arrieta opcionó la propiedad a la Sra. Curet Miranda durante el mismo periodo en que la Srta. Glendaly Hernández le estaba dando seguimiento al trámite de la propiedad, por ella opcionada.

21. Antes de concluir el contrato de opción con la Srta. Glendaly Hernández, los demandados no hicieron ningún tipo de gestión para darle seguimiento a la información del préstamo que el señor Arrieta entendía que no había recibido de parte de la

demandante. Expresó bajo juramento el señor Arrieta que: "yo no tengo que hacer ninguna gestión pa' eso".

22. Ni el señor Arrieta, ni Arrieta Realty dieron seguimiento a la Srta. Glendaly Hernández para efectos del cumplimiento con la Cláusula 17, ni notificaron la resolución del contrato. El señor Arrieta decidió dar por cancelado el contrato automáticamente.

23. La señora Torres vendió el inmueble a la Sra. Curet Miranda, el 29 de diciembre de 2021, dentro del término de vigencia del Contrato.

24. El 5 de enero de 2022, antes del vencimiento de la opción, mientras la demandante se encontraba entusiasmada por la compraventa de su residencia y en gestiones para completar la misma, el señor Arrieta le informó que "la Lcda. Torres Sánchez ya no quería venderle la propiedad porque prefería alquilarla" y "que se olvidara de la casa".

25. El 11 de enero de 2022, fue cuando finalmente la demandante supo que la propiedad había sido vendida, el 29 de diciembre de 2021, a la Sra. Curet Miranda.

26. En el contrato de opción firmado entre la Srta. Glendaly Hernández y la señora Torres, las partes acordaron cooperar y realizar las gestiones pertinentes, para que el cierre de esta compraventa se pudiera llevar a cabo dentro de cuarenta y cinco (45) días calendarios, antes del 28 de enero de 2022.

27. El contrato de opción firmado entre la Srta. Glendaly Hernández y la señora Torres también establecía que la parte Vendedora y el corredor de bienes raíces tendrían derecho a retener el depósito de opción de $7,000 si: a. b. c. el préstamo fuera denegado a la compradora; si la Srta. Glendaly Hernández incumplía con los requisitos establecidos por la entidad financiera por falta de diligencia; o si rehusaba formalizar el contrato, según sus términos.

28. El 21 de enero del 2022, el Sr. Antonio Arrieta generó el cheque mediante el cual le devolvió a la Srta. Glendaly Hernández su depósito de opción, por el total de $7,000.

29. Al momento de determinar dejar sin efecto el contrato y venderle a otra persona la propiedad, ese asunto lo decidieron el señor Arrieta junto a la señora Torres. O sea, que tanto el señor Arrieta como la señora Torres tomaron la decisión de resolver el contrato.

30. Para diciembre de 2021, cuando surgen los hechos objeto de esta demanda, el dueño de Arrieta Realty

era el codemandado, señor Arrieta. No obstante, posterior a los hechos, él traspasó la propiedad a su hijo, el Dr. Antonio Arrieta Alicea.

Luego, resaltó que a pesar de que los apelantes habían argumentado que la devolución de los $7,000.00 dados en calidad de depósito constituía un pago en finiquito, este asunto fue resuelto en la negativa por el TA mediante su *Sentencia* del 28 de octubre de 2024, la cual era final y firme. Así pues, tras evaluar la prueba que constaba en el expediente, determinó que existió un contrato de opción y que las acciones culposas de los apelantes resultaron en su incumplimiento. A causa de lo anterior, juzgó que se le causaron daños a la señora Hernández y que estos estaban relacionados a las actuaciones de los apelantes. En virtud de ello, declaró Ha Lugar a la reclamación de epígrafe. En consecuencia, ordenó a los apelantes a pagar solidariamente las siguientes sumas: $82,174 por los daños causados a la apelada; $50,000.00 por lucro cesante y $5,000.00 por las costas y honorarios de abogado.

En desacuerdo, el 8 de enero de 2026, los apelantes presentaron una *Moción Solicitando Reconsideración a Sentencia.*[19] Por su parte, el 15 de enero de 2026, la señora Hernández presentó su *Oposición a Reconsideración.*[20] Examinado los escritos, el 16 de enero de 2026, el TPI dictó una *Resolución Interlocutoria* que se notificó el 20 de enero de 2026, donde declaró No Ha Lugar a la solicitud de reconsideración.

Aun inconforme, el 18 de febrero de 2026, los apelantes presentaron el recurso de epígrafe y formularon los siguientes señalamientos de error:

**ERRO EL TPI AL EMITIR SENTENCIA CONTRARIA A DERECHO TODA VEZ QUE SE SOLICITÓ UNA DESESTIMACIÓN BAJO LA REGLA 39.2 C, HACIENDO RESERVA ESPECÍFICA DE QUE SI NO PROCEDIA, LA PARTE DEMANDADA APELANTE PRESENTARÍA INMEDIATAMENTE SU PRUEBA. SE**

---

[19] *Véase*, Entrada Núm. 186, SUMAC TPI.
[20] *Véase*, Entrada Núm. 187, SUMAC TPI.

**EMITE SENTENCIA SIN PERMITIR A LA DEMANDADA PRESENTAR PRUEBA, HECHO CONTRARIO A DERECHO.**

**ERRÓ EL TPI AL INTERPRETAR LAS REGLAS DE EVIDENCIA NO CONFORME A DERECHO, AL EXCEDERSE DE SUS FACULTADES EN LA ADMISIÓN E INTERPRETACIÓN DE EVIDENCIA SIN TESTIMONIO EXPERTO REQUERIDO EN DERECHO.**

**ERRÓ EL TPI AL ORDENAR A LOS DEMANDADOS ÁNGELES TORRES SÁNCHEZ, ANTONIO ARRIETA SEPÚLVEDA Y ARRIETA REALTY A PAGAR SOLIDARIAMENTE A LA PARTE DEMANDANTE APELADA, BAJO LA FIGURA DE LUCRO CESANTE, LA CANTIDAD DE $50,000.00, CONTRARIO A DERECHO Y EN TOTAL AUSENCIA DE PRUEBA PERICIAL, TESTIFICAL Y DOCUMENTAL QUE SUSTENTARA DICHA CANTIDAD.**

**ERRÓ EL TPI AL AL (sic) ORDENAR A LOS DEMANDADOS ÁNGELES TORRES SÁNCHEZ, ANTONIO ARRIETA SEPÚLVEDA Y ARRIETA REALTY A PAGAR SOLIDARIAMENTE A LA PARTE DEMANDANTE APELADA LA CANTIDAD DE $82,174.00 BAJO LA FIGURA DE DAÑOS CONTRARIO A DERECHO Y EN TOTAL AUSENCIA DE PRUEBA PERICIAL, TESTIFICAL Y DOCUMENTAL QUE SUSTENTE DICHA CANTIDAD.**

Atendido el recurso, el 19 de febrero de 2026, emitimos una *Resolución* donde le concedimos a la parte apelante hasta el 23 de febrero de 2026, para informarnos si se proponía reproducir la transcripción de la prueba oral del caso de epígrafe. En cumplimiento con lo anterior, el 20 de febrero de 2026, los apelantes presentaron una *Moción Informativa en Cumplimiento de Orden*. Allí, notificaron que sí interesaban presentar la transcripción de la prueba oral y, además, que esta fue solicitada en su moción de reconsideración fechada el 8 de enero de 2026.

Examinado el escrito, en esta misma fecha, emitimos una *Resolución* donde ordenamos a las partes estipular la transcripción de la prueba oral en un plazo de veinte (20) días una vez fuesen notificados de su disponibilidad. Una vez presentada la prueba estipulada, le concedimos a la parte apelada un plazo de veinte (20) días para presentar su alegato en oposición, asimismo, de estimarlo

necesario, la parte apelante podrá presentar un alegato suplementario dentro del mismo término.

Luego de varios asuntos procesales, el 30 de abril de 2026, los apelantes presentaron una *Moción Informativa en cumplimiento de Orden* donde notificaron que la transcripción de la prueba oral quedaba debidamente estipulada tras acoger el arreglo propuesto por la apelada.

Subsiguientemente, el 1 de mayo de 2026, la señora Hernández presentó un *Alegato de la parte apelada y Solicitud de Desestimación por falta de perfeccionamiento, a tenor con la Regla 16(E)*. Respecto el petitorio de desestimación, sostuvo que los apelantes excluyeron del apéndice documentos que eran esenciales para la adecuada revisión de su solicitud. Por lo cual, arguyó que estos incumplieron con el perfeccionamiento del recurso por lo que procedía su desestimación.

De otra parte, el 5 de mayo de 2026, la apelada presentó una *Moción Informativa y en cumplimiento de Orden* donde informó que procedió a estipular la transcripción propuesta luego de haberse acogido el cambio sugerido.

En esta misma fecha, emitimos una *Resolución* donde aceptamos la transcripción de la prueba oral como estipulada por las partes. Igualmente, los apelantes presentaron su *Moción oposición a desestimación desestimación* (sic) *por falta de perfeccionamiento, a tenor con la Regla 16 (E) en cumplimiento de Orden*. Allí, en esencia, alegaron que los documentos omitidos no eran pertinentes para el recurso de epígrafe toda vez que el error reclamado era uno estrictamente en derecho. A su vez, puntualizó que el expediente completo se podía acceder por medio de SUMAC y que nuestro ordenamiento jurídico favorece la adjudicación en los méritos sobre tecnicismos procesales. Por lo que, solicitó que se declarara No Ha Lugar la solicitud de desestimación.

El 6 de mayo de 2026, emitimos una *Resolución* donde declaramos No Ha Lugar la petición de desestimación.

Así, recibida la transcripción de la prueba oral debidamente estipulada y con el beneficio de la comparecencia de las partes, procedemos a atender el asunto ante nuestra consideración. *Veamos.*

## II.

### -A-

Las obligaciones surgen de la ley, los contratos, los cuasicontratos, los actos lícitos, las acciones u omisiones en la cual medie culpa o negligencia y cualquier otro acto idóneo para producirlas, conforme con el ordenamiento jurídico. Art. 1063 del Código Civil de 2020, 31 LPRA sec. 8984. En lo pertinente al asunto ante nos, los contratos son un negocio jurídico bilateral en el cual dos o más partes prestan su consentimiento para crear, regular, modificar o extinguir obligaciones. Art. 1230 del Código Civil de 2020, 31 LPRA sec. 9751. Los contratos son negocios jurídicos desde que las partes manifiestan su consentimiento sobre el objeto y la causa. Art. 1237 del Código Civil de 2020, 31 LPRA sec. 9772. Mediante un contrato las partes pueden acordar cualquier cláusula que no sea contraria a la ley, a la moral o al orden público. Art. 1232 del Código Civil de 2020, 31 LPRA sec. 9753. Aquellas obligaciones derivadas de un contrato tendrán fuerza de ley entre las partes, sus sucesores y ante terceros en la forma que dispone la ley. Art. 1233 del Código Civil 2020, 31 LPRA sec. 9754. Consecuentemente, los tribunales no podemos relevar a una parte de cumplir con el contrato cuando éste es legal y válido y no contiene vicio alguno. *Mercado, Quilichini v. U.C.P.R.*, 143 DPR 610, 627 (1997).

Cónsono con lo anterior, sabido es que, en el ámbito de las obligaciones y contratos, es una doctrina fundamental que cuando los términos de un contrato son claros, y no dejan lugar a dudas

sobre la intención de los contratantes, no cabe recurrir a reglas de interpretación. Art. 354 del Código Civil de 2020, 31 LPRA sec. 6342. Los términos de un contrato se reputan claros "cuando por sí mismos son bastantes lúcidos para ser entendidos en un único sentido, sin dar lugar a dudas, controversias, ni diversidad de interpretaciones y sin necesitar para su comprensión razonamientos o demostraciones susceptibles de impugnación". *S.L.G. Francis-Acevedo v. SIMED,* 176 DPR 372, 387 (2009). Así pues, en ausencia de ambigüedad, las cláusulas del contrato obligan a los contratantes. Íd.

Ahora bien, en lo pertinente a la controversia ante nos, el Artículo 1235 del Código Civil de 2020, 31 LPRA sec. 9756, dispone que un contrato preliminar se denomina Opción cuando se "le atribuye a una sola de las partes la facultad de decidir sobre la celebración del contrato futuro". Así, nuestro más alto foro lo ha definido como sigue: "el convenio por el cual una parte (llamada concedente, promitente u optatario) concede a la otra (llamada optante), por tiempo fijo y en determinadas condiciones, la facultad, que se deja exclusivamente a su arbitrio, de decidir respecto a la celebración de un contrato principal". *Conklin y otros v. Passalacqua y otros,* 2026 TSPR 18, 217 DPR __. En otras palabras, este contrato es un contrato preparatorio o precontrato encaminado al eventual otorgamiento de un contrato de compraventa. Ahora bien, los elementos esenciales de este contrato son: (1) se le concede al optante la facultad de decidir unilateralmente si celebrará el contrato principal (compraventa) sin ninguna obligación por parte de éste; (2) dicha concesión tiene carácter de exclusividad; (3) se establece un plazo para ejercitar la opción; y, por último, (4) no existe otra condición que no sea la voluntad del optante. *SLG Irizarry v. SLG García,* 155 DPR 713, 722 (2001).

**-B-**

Los tribunales están facultados a "resolver diligentemente los asuntos ante su consideración, ateniéndose al sistema de fuentes del ordenamiento jurídico establecido". Art. 6 del Código Civil de 2020, 31 LPRA sec. 5316. Consonó con lo anterior, mediante la jurisprudencia, nuestro más alto foro ha incorporado la doctrina de los actos propios. Particularmente, esta norma procura que las personas no vayan en contra de sus propios actos, y que actúen de buena fe en el ejercicio de sus derechos y en el cumplimiento de las obligaciones en las que incurran en variadas relaciones jurídicas. *Vivoni Farage v. Ortiz Carro*, 179 DPR 990, 1010 (2010). Así pues, el propósito de esta doctrina es "proteger la confianza depositada en la apariencia, que es, por extensión, la protección de un interés social o la consecución de un ideal de justicia". *Aponte Valentín, et al v. Pfizer Pharm.*, 208 DPR 263, 287 (2021). En vista de ello, el Tribunal Supremo ha sido enfático en establecer que la conducta contradictoria no tiene lugar en el campo del derecho y debe ser impedida. Íd.

La aplicación de la doctrina de actos propios está sujeta a la concurrencia de los siguientes elementos: (a) una conducta determinada de un sujeto; (b) que haya engendrado una situación contraria a la realidad, esto es, aparente y, mediante tal apariencia, susceptible de influir en la conducta de los demás, y, por último, (c) que sea base de la confianza de otra parte que haya procedido de buena fe y que, por ello, haya obrado de una manera que le causaría un perjuicio si su confianza quedara defraudada. *Alonso Piñero v. UNDARE, Inc.*, 199 DPR 32, 55-56 (2017).

En fin, en virtud de la doctrina de actos propios, un litigante está impedido de adoptar una actitud que sea contradictoria con una conducta anterior, sobre la cual la parte perjudicada ha confiado, y ello sin importar la verdadera intención de la parte que

genera esa confianza. *Pardo v. Sucn. Stella,* 145 DPR 816, 829 (1998).

**-C-**

El Código Civil de Puerto Rico distingue entre los daños derivados del incumplimiento de contrato, a saber, el Art. 1158 del Código Civil de 2020, 31 LPRA sec. 9303 y los daños derivados de la culpa extracontractual, Art. 1536 del Código Civil de 2020, 31 LPRA sec. 10801. En ambas causas de acción, la indemnización de daños exige una conducta antijurídica causante de los daños, bien por infringir lo acordado en contrato o bien por infringir el principio general de no causar daño a nadie. *Ramos v. Orientalist Rattan Furnt., Inc.,* 130 DPR 712, 722 (1992). Sin embargo, el deber de indemnizar es distinto en ambos tipos de reclamaciones. Particularmente, procede la acción en daños contractuales al amparo del Art. 1158 del Código Civil de 2020, *supra,* cuando el daño sufrido exclusivamente surge como consecuencia del incumplimiento de una obligación específicamente pactada, daño que no ocurriría sin la existencia del contrato.

Por otra parte, la acción extracontractual responde al quebrantamiento del deber general de no causar daño a los demás. *Rivera Sanfeliz et al. v. Jta. Dir. FirstBank,* 193 DPR 38, 57 (2015). Mediante esta acción se pretenden reparar los daños "que se producen en el desarrollo de cualesquiera actividades humanas, pero al margen de toda relación jurídica previa entre dañador y víctima". *Ramos v. Orientalist Rattan Furnt., Inc.,* supra, pág. 720. Contrario a lo que ocurre con la responsabilidad contractual, la que se origina del Art. 1536 del Código Civil de 2020, *supra,* "surge precisamente como resultado del daño sin que haya mediado relación jurídica previa". *Rivera Sanfeliz et al. v. Jta. Dir. FirstBank,* supra, pág. 57. En fin, la culpa extracontractual no nace de la voluntad de las partes, sino del incumplimiento de unas

obligaciones y unos deberes impuestos por la naturaleza y por la ley, necesarias para la convivencia. *Ramos v. Orientalist Rattan Furnt., Inc.*, supra, pág. 721 citando a: H.M. Brau del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, 2da ed., San Juan, Pubs. JTS, 1986, Vol. 1, Cap. I, pág. 42.

No obstante sus diferencias, ambas acciones comparten elementos esenciales. *Muniz-Olivari v. Stiefel Labs.*, 174 DPR 813, 819 (2008). En una reclamación por incumplimiento contractual, la parte promovente debe demostrar la existencia de los daños alegados, el incumplimiento culposo o doloso de la obligación asumida y la relación causal entre dicho incumplimiento y los daños reclamados. Íd. citando a: J. Castán Tobeñas, *Derecho Civil Español Común y Foral*, 16ta ed., Madrid, Ed. Reus, 1992, T. 3, pág. 272.

En nuestro ordenamiento jurídico, los daños morales también son susceptibles de indemnización en una acción por incumplimiento contractual. Íd., págs. 820-821. La norma vigente dispone que procede compensar los sufrimientos y las angustias mentales debidamente probados cuando estos hayan sido previsibles al momento de constituirse la obligación y constituyan una consecuencia necesaria de su incumplimiento. Íd. Corresponde al tribunal evaluar las circunstancias particulares de cada caso para determinar si los daños reclamados fueron efectivamente probados, si eran previsibles al momento de contratar y si guardan una relación causal con el incumplimiento alegado. Íd.

**-D-**

Valorar los daños es uno de los ejercicios de la función judicial más complejos, puesto que implica adjudicar un valor monetario a un daño que solamente puede ser aprehendido en toda su extensión por quien lo sufre. Tan es así que en innumerables ocasiones nuestro más Alto Foro ha manifestado que "la tarea judicial de estimar y valorar los daños resulta difícil y angustiosa, debido a que

no existe un sistema de computación que permita llegar a un resultado exacto en relación con el cual todas las partes queden satisfechas y complacidas". *Herrera, Rivera v. SLG Ramírez-Vincens*, 179 DPR 774, 784 (2010). Asimismo, es norma retirada que los foros apelativos no deben intervenir con "la estimación de los daños que los tribunales de instancia realicen, salvo cuando la cuantía concedida advenga ridículamente baja o exageradamente alta". Íd., págs. 784-785. Lo anterior responde al hecho de que la valoración de daños está sujeta a un grado de especulación que conlleva elementos subjetivos como la discreción, el sentido de justicia y la conciencia humana del juzgador de los hechos. Íd.

Apoyado en lo anterior, el Tribunal Supremo ha sido enfático en que a la hora de evaluar si la compensación concedida es ridículamente baja o exageradamente alta, se debe examinar la prueba desfilada ante el TPI y las cuantías que se otorgaron en casos similares resueltos anteriormente. *Santiago Montañez v. Fresenius Medical*, 195 DPR 476, 491 (2016). En tal sentido, las indemnizaciones que se concedieron en casos anteriores constituyen un punto de partida y referencia útil para pasar juicio sobre las concesiones que se otorgaron en el foro de primera instancia. Ello, aun cuando se debe reconocer que no existen dos (2) casos exactamente iguales y que cada uno es distinguible según sus circunstancias. Íd. Ahora bien, estas compensaciones de los casos anteriores deben ajustarse al valor presente. Íd. Sobre este particular, el Tribunal Supremo ha establecido la siguiente metodología:

> En *Herrera, Rivera v. S.L.G. Ramírez-Vicéns*, supra, acogimos el método que recomendó el exjuez Antonio Amadeo Murga (Amadeo Murga) para actualizar al valor presente las compensaciones otorgadas en casos similares anteriores. Conforme a ese método, utilizamos el cambio en el poder adquisitivo del dólar a través del tiempo para obtener el ajuste por inflación. A su vez, el valor adquisitivo del dólar lo obtuvimos del índice de precios al consumidor que prepara el Departamento del

Trabajo y Recursos Humanos (Departamento del Trabajo). Una vez obtenido el ajuste por inflación, realizamos un ajuste adicional por el crecimiento económico ocurrido entre el año del caso que se utiliza como referencia y el año cuando se dictó sentencia en el caso que teníamos ante nuestra consideración.

[...]

Recientemente, en *Rodríguez et al. v. Hospital et al.*, [186 DPR 889 (2012)], reconocimos que no hay consenso entre los expertos en cuanto al método que debe utilizarse para actualizar las compensaciones concedidas en el pasado y optamos por acoger el método que utiliza el índice de precios al consumidor con el 2006 como año base. Empero, rechazamos realizar el ajuste que recomendó Amadeo Murga y adoptamos la postura del Prof. José Julián Álvarez González, quien desfavorece que se haga un ajuste adicional por el crecimiento económico cuando se utiliza el nuevo índice de precios al consumidor. Así, concluimos que cuando utilizamos un índice de precios al consumidor cuyo año base es reciente, es innecesario realizar el ajuste que señala Amadeo Murga como segunda parte del proceso de actualización de las partidas concedidas *Rodríguez et al. v. Hospital et al.* Íd., págs. 495–97 (citas omitidas).

Del mismo modo, el Tribunal Supremo de Puerto Rico ha advertido a los jueces y juezas sobre la importancia de detallar en sus dictámenes los casos que se utilicen como referencia o punto de partida para la estimación y valoración de daños y el cómputo realizado para establecer las cuantías que se concedan. Íd., pág. 493. De la misma forma nuestro más Alto Foro expresó que:

Este llamado a los jueces y las juezas cobra importancia ante la necesidad imperante de instruir a las partes y a los miembros de la profesión jurídica en torno al método que se utiliza en ese difícil y angustioso proceso de estimar y valorar los daños. Habida cuenta de que esa tarea lleva consigo cierto grado de especulación, es forzoso explicar qué casos se utilizan como referencia y cómo las cuantías concedidas se ajustan en esos casos anteriores al caso que el tribunal tiene ante su consideración. Íd.

En resumen, a la hora de valorizar los daños, se ha establecido que los juzgadores de los hechos deben realizar un ejercicio de dos pasos el cual se estableció en *Santiago Montañez v. Fresenius Medical,* supra. *Sucn. Mena Pamias et al. v. Meléndez et al.*, 212 DPR 758, 771 (2023). El primer paso es evaluar aquellos casos comparables que serán utilizados como punto de partida para

determinar las cuantías, los cuales deberán ser detallados en los dictamines de los foros primarios y el segundo paso es que los tribunales sentenciadores deberán tomar en consideración "las circunstancias particulares del caso considerado ante el tribunal". Íd., pág. 770. Es decir, el juez o la jueza no puede descansar meramente en un cálculo matemático. Íd., pág. 771.

-E-

La Regla 42.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 42.2, establece que las determinaciones de hechos que toma el TPI a base de testimonio oral "no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de las personas testigos". Asimismo, la Regla 110 de Evidencia, 32 LPRA Ap. VI, R.110, dispone que será el juzgador de hechos quien deberá evaluar la prueba presentada con el propósito de determinar cuáles hechos fueron establecidos o demostrados. Por tal razón, es norma reiterada que cuando se le solicita a un foro apelativo que revise cuestiones de hechos, la apreciación de la prueba, en primera instancia, le corresponde al tribunal sentenciador, ya que estos tienen la oportunidad de observar y oír a los testigos, y por ello, están en mejor posición de evaluarla. *Pueblo v. Acevedo Estrada*, 150 DPR 84, 98-99 (2000). En ese sentido, la evaluación del foro sentenciador merece respeto y deferencia. *González Hernández v. González Hernández*, 181 DPR 746, 776 (2011).

Cónsono con ello, por lo general, "los tribunales apelativos no intervenimos ni alteramos innecesariamente las determinaciones de hechos que hayan formulado los tribunales de primera instancia luego de admitir y aquilatar la prueba presentada durante el juicio". *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 65 (2009). No debemos descartar las determinaciones "tajantes y

ponderadas del foro de instancia" y sustituirlas por nuestra propia apreciación a base de un examen del expediente del caso. Íd., págs. 65-66. Ahora bien, el respeto al arbitrio del juzgador de hechos "no es absoluto" pues "[u]na apreciación errónea de la prueba no tiene credenciales de inmunidad" frente a nuestra función revisora. *Ramos Acosta v. Caparra Dairy Inc.*, 113 DPR 357, 365 (1982). Los foros apelativos podremos intervenir con la apreciación de la prueba cuando exista error manifiesto, pasión, prejuicio, parcialidad o cuando un análisis integral, detallado y minucioso de la prueba así lo justifique. *Pueblo v. Casillas, Torres*, 190 DPR 398, 426 (2014); *González Hernández v. González Hernández, supra,* pág. 777. Por otro lado, al evaluar conclusiones de hecho a base de prueba pericial o documental, estamos en igual posición que el foro recurrido. Íd.

**-F-**

En los contratos con prestaciones recíprocas, el Art. 1255 del Código Civil de 2020, 31 LPRA sec. 9823, reconoce el derecho de la parte perjudicada por el incumplimiento de una obligación principal a reclamar el cumplimiento de la prestación o la resolución del contrato, junto con el correspondiente resarcimiento de daños. Así, nuestro ordenamiento permite que la parte afectada por el incumplimiento contractual solicite la compensación de aquellos daños y perjuicios que sean consecuencia de dicho incumplimiento.

Con arreglo a lo antes dicho, el Art. 1167 del Código Civil de 2020, 31 LPRA sec. 9331, delimita el alcance de la indemnización por incumplimiento contractual al disponer que la compensación por daños y perjuicios comprende tanto el daño emergente como el lucro cesante. Respecto a estos dos tipos de daños, el tratadista Manresa explica que:

> En primer lugar, ordena compensar a la persona que ha sido privada de lo que ya tenía. A esto se le conoce como *daño emergente* o *daño positivo.* En segundo

lugar, también provee una compensación cuando se impide a una persona aprovecharse de lo que le hubiera correspondido. A esta segunda modalidad de daños se le conoce como *lucro cesante* o *daño negativo*. *El Coqui Landfill v. Mun. Gurabo*, 186 DPR 688, 697 (2012) citando a J.M. Manresa y Navarro, *Comentarios al Código Civil español*, Madrid, Ed. Reus, 1967, T. VIII, Vol. I, pág. 276.

Sobre el lucro cesante, nuestro Tribunal Supremo ha expresado que la compensación por dicha figura equivale a la partida de daño que debe resarcirse por razón de la pérdida de ingresos infligida al perjudicado y la correspondiente disminución de su capacidad productiva. *S.L.G. Rodríguez v. Nationwide*, 156 DPR 614, 623–624 (2002). Más específicamente, es una ganancia futura frustrada que con cierta probabilidad era de esperarse según el curso natural de los acontecimientos. *P.R.F.S v. Promoexport*, 187 DPR 42, 61 (2012).

No obstante, lo que se compensará el acreedor será las ganancias dejadas de percibir, no necesariamente todo ingreso futuro frustrado. *El Coqui Landfill v. Mun. Gurabo*, supra, pág. 697. Del mismo modo, puede constituir lucro cesante la pérdida de negocios o contratos con terceros que razonablemente se hubieran concretado de no haber ocurrido el incumplimiento del deudor. *P.R.F.S. v. Promoexport*, supra, pág. 61. Ahora bien, los daños y perjuicios compensables son aquellos previstos o previsibles al tiempo de constituirse la obligación. Art. 1168 del Código Civil de 2020, 31 LPRA sec. 9332.

En *Perez v. Sampedro*, 86 DPR 526 (1962), nuestro Máximo Foro tuvo la oportunidad de atender una reclamación de daños y perjuicio a causa de un incumplimiento contractual en una opción de compra. No obstante, en dicho caso se rehusó expresarse en cuanto los métodos para llevar a cabo la concesión de daños por los siguientes fundamentos:

Cualquiera que sea la medida de los daños en un caso como el presente, el demandante dejó de probar esos

daños. En el supuesto, según lo resuelve la sentencia recurrida, que la medida de daños sea la diferencia entre el precio fijado en el contrato y el valor de los terrenos a la fecha de su incumplimiento y aceptando arguendo, la proposición del recurrente de que tal incumplimiento ocurrió por lo menos en 1952, no hay base en el récord para determinar, sin entrar en el campo de la especulación el valor de las tierras para dicho año. Por el contrario, si la medida de los daños, según sostiene el recurrente, es el valor del contrato al momento en que debió ejecutarse, ya éste fuera en el año 1947 o en el año 1952, tampoco hay prueba indicativa de dicho valor. Íd., págs. 531-532.

Así, para que una acción en reclamación de daños y perjuicios por incumplimiento de contrato pueda prosperar, no basta con que el actor demuestre el incumplimiento de la obligación por el deudor, sino también se debe demostrar la existencia real y positiva de los daños causados. Íd., pág. 530. Por lo cual, cuando un demandante en una acción en reclamación de daños y perjuicios por incumplimiento de contrato deja de probar la pérdida sufrida como la ganancia dejada de obtener, su acción no puede prosperar. Íd., pág. 532.

### III.

En el presente recurso, los apelantes solicitaron la revocación de la *Sentencia* que el TPI dictó el 22 de diciembre de 2025. En síntesis, sostuvieron que el TPI incidió al privarlos de presentar prueba luego de solicitar una desestimación al amparo de la Regla 39.2(c) de Procedimiento Civil, *supra*; al interpretar la evidencia y adjudicar daños sin prueba pericial; al conceder una partida de $50,000.00 por concepto de lucro cesante; y al otorgar $82,174.00 en daños sin que existiera prueba suficiente que sustentara dicha cuantía. Por estar íntimamente relacionados, discutiremos conjuntamente los señalamientos de error segundo y tercero, y posteriormente atenderemos el cuarto señalamiento de error.

En cuanto al primer señalamiento de error, los apelantes sostuvieron que el TPI les privó de presentar su prueba luego de que solicitaran una desestimación al amparo de la Regla 39.2(c) de

Procedimiento Civil, *supra.* Alegaron que, al presentar dicha solicitud, expresamente reservaron su derecho a presentar prueba en caso de que la moción fuese declarada sin lugar y que, no obstante ello, el tribunal emitió sentencia sin brindarles dicha oportunidad.

Sin embargo, un examen cuidadoso del expediente revela que este planteamiento no fue presentado oportunamente ante el TPI. De los autos surge que, luego de emitida la *Sentencia,* los apelantes solicitaron reconsideración. No obstante, en dicha solicitud se limitaron a cuestionar la suficiencia de la prueba para sostener las partidas concedidas por el tribunal y la procedencia de los daños adjudicados. En ningún momento plantearon que el TPI hubiese errado al no permitirles presentar prueba luego de su solicitud de desestimación ni solicitaron remedio alguno relacionado con esa alegada irregularidad procesal.

Es norma reiterada que los tribunales apelativos no debemos adjudicar cuestiones que no fueron oportunamente planteadas ante el TPI. *Sánchez Ruiz v. Higuera Pérez et al.*, 203 DPR 982, 993 (2020); *Trabal Morales v. Ruiz Rodríguez*, 125 DPR 340, 351 (1990). Ello responde a principios elementales de economía procesal y de deferencia institucional, pues corresponde al TPI tener la primera oportunidad de atender y corregir los errores que se le atribuyen. En consecuencia, al haber sido levantado este planteamiento por primera vez ante este Tribunal, no procede atenderlo en sus méritos.

Distinta es la situación respecto a los restantes señalamientos de error, los cuales cuestionan la suficiencia de la prueba para sostener las partidas concedidas por el TPI. Los apelantes argumentaron que el TPI erró al interpretar la evidencia presentada y al conceder una partida por lucro cesante sin contar con prueba pericial que permitiera establecer adecuadamente dicha pérdida económica. Asimismo, sostuvieron que la prueba presentada fue

insuficiente para demostrar la existencia y cuantía de los daños reclamados.

No les asiste la razón en cuanto a su planteamiento general de que era indispensable la presentación de prueba pericial para establecer cualquier daño. Como correctamente señaló la apelada, nuestro ordenamiento no exige prueba pericial en todos los casos donde se reclaman daños derivados de un incumplimiento contractual. Corresponde al juzgador de los hechos evaluar la totalidad de la prueba presentada y determinar cuáles hechos quedaron demostrados. Regla 110 de Evidencia, *supra*. De igual forma, las determinaciones de credibilidad efectuadas por el tribunal sentenciador merecen gran deferencia apelativa. *González Hernández v. González Hernández*, supra, pág. 776.

Ahora bien, ello no significa que toda partida concedida por el TPI encuentre necesariamente apoyo en la prueba presentada. Como vimos, el Art. 1167 del Código Civil de 2020, *supra*, reconoce que la indemnización por incumplimiento contractual comprende tanto el daño emergente como el lucro cesante. Este último persigue compensar aquellas ganancias que, con cierta probabilidad y conforme al curso natural de los acontecimientos, el acreedor habría obtenido de no haber mediado el incumplimiento. *S.L.G. Rodríguez Santiago v. Nationwide*, supra; *P.R.F.S. v. Promoexport*, supra. No obstante, para que proceda una compensación por dicho concepto, no basta con demostrar el incumplimiento contractual. También es necesario probar la existencia real y positiva de la pérdida reclamada. *Pérez v. Sampedro*, supra, pág. 530.

Precisamente sobre este particular, en *Pérez v. Sampedro*, supra, nuestro Tribunal Supremo atendió una reclamación de daños derivada del incumplimiento de una opción de compra y concluyó que no procedía conceder lucro cesante cuando la prueba presentada no permitía determinar, sin entrar en el campo de la

especulación, el valor de la propiedad en el momento pertinente para efectuar el cálculo de los daños. Íd., págs. 531-532. De igual forma, el Tribunal reiteró que cuando una parte deja de probar la pérdida sufrida o la ganancia dejada de obtener, su reclamación no puede prosperar. Íd., pág. 532.

En el caso de autos, la apelada declaró que la propiedad que se proponía adquirir por virtud del contrato de opción tenía un precio de $275,000.00 y que, al momento de radicarse la demanda, dicha propiedad "ya iba por $325,000".[21] Además, expresó que "[e]s un dinero de un valor de la propiedad que yo voy a dejar de tener" y que "[e]so es un valor que yo estoy dejando de adquirir".[22] Asimismo, sostuvo que entre los daños reclamados se encontraba "la pérdida de valor a futuro que dejé de obtener en la propiedad".[23] Por otro lado, presentó evidencia relacionada con una tasación realizada en el año 2025. Sin embargo, dicha prueba únicamente refleja una valoración efectuada varios años después de los hechos que dieron origen a la controversia y del alegado incumplimiento contractual. Consecuentemente, la misma no provee una base adecuada para determinar cuál era la ganancia dejada de percibir por la apelada como consecuencia directa del incumplimiento reclamado.

Del mismo modo, de la prueba presentada no surge evidencia que permita establecer con certeza razonable una pérdida económica concreta atribuible al alegado incremento en valor de la propiedad. Por el contrario, la reclamación descansa fundamentalmente en la expectativa de que el inmueble habría continuado apreciándose en el mercado y en la posibilidad de que dicha apreciación hubiese redundado en un beneficio económico para la apelada. Tales planteamientos resultan insuficientes para

---

[21] *Véase*, pág. 118, líneas 11-12 de la transcripción de la prueba oral.
[22] *Véase*, pág. 118, líneas 13-14 y pág. 166, líneas 12-13 de la transcripción de la prueba oral.
[23] *Véase*, pág. 166, líneas 1-2 de la transcripción de la prueba oral.

sostener una concesión por concepto de lucro cesante, pues descansan en circunstancias futuras cuya realización no fue demostrada mediante prueba objetiva.

Por consiguiente, concluimos que la prueba presentada no permitió establecer de forma real y positiva la ganancia dejada de percibir que serviría de fundamento para una indemnización por lucro cesante. En consecuencia, erró el TPI al conceder la suma de $50,000.00 bajo dicho concepto y procede eliminar esa partida de la *Sentencia* apelada.

Lo anterior, sin embargo, no dispone de la controversia relativa a los daños sufridos por la apelada. En cuanto a la suma de $82,174.00 concedida por el TPI, surge de la *Sentencia* que dicha cuantía fue adjudicada tomando como referencia la cantidad total de intereses hipotecarios que la apelada alegadamente pagaría durante la vida del préstamo obtenido para adquirir otra propiedad luego de frustrarse la transacción objeto del presente pleito. En esencia, el tribunal aceptó el planteamiento de que, debido al aumento en las tasas de interés hipotecario ocurrido entre una transacción y otra, la apelada terminaría pagando una cantidad adicional de intereses a largo plazo.

No obstante, coincidimos con los apelantes en que dicha partida no podía sostenerse tal y como fue concedida. La cantidad adjudicada representa una proyección futura de intereses a lo largo de décadas y descansa sobre múltiples variables que no fueron objeto de prueba suficiente. De igual forma, dicha cuantía no responde propiamente a una valoración de daños morales o emocionales ni a un cálculo de lucro cesante reconocido por nuestro ordenamiento. En consecuencia, entendemos que la suma de $82,174.00 no encuentra adecuado apoyo jurídico ni probatorio en el expediente.

Ahora bien, de la Demanda Enmendada surge que la señora Hernández no limitó su reclamación a pérdidas económicas derivadas del incumplimiento contractual, sino que también solicitó una indemnización por los sufrimientos, angustias mentales y daños emocionales alegadamente ocasionados por la conducta de los apelantes. Por ello, corresponde examinar si la prueba presentada durante el juicio sostuvo una compensación bajo dicho concepto, independientemente de que la cuantía específica concedida por el TPI no pueda mantenerse en los términos en que fue calculada.

Sobre este particular, concluimos que la evidencia testifical desfilada sí sostiene una compensación por concepto de angustias mentales y daños emocionales. Durante el juicio, al describir el momento en que advino en conocimiento de que la propiedad objeto del contrato de opción había sido vendida a otra persona, la apelada declaró:

> "O sea, fueron momentos de mucho estrés porque a pesar de que uno siempre consigue dónde quedarse, porque a mí mi familia no me va a desamparar. Eran un montón de cosas que yo decía, '¿Qué hago con mis muebles? ¿Qué hago con esto? ¿Qué, qué? Tengo que mudarme, tengo que – voy a tener que pagar dos mudanzas donde yo ponga todos mis muebles. Los voy a tener que poner en un almacén, dejarlos allí, en lo que consigo otro sitio. ¿Y si el otro realtor me hace lo mismo que me hizo Arrieta?'"[24]

Asimismo, expresó: "O sea, fueron como que un montón de cosas que – la desconfianza, el 'Dios mío, ¿por qué?', tú sabes, como que – fue bien desesperante ese momento. Fue bien desesperante".[25]

Más adelante, al explicar los efectos que la situación tuvo sobre ella, declaró que: "Encima de esto, yo tuve que obviamente estar en tratamiento psicológico por todos estos meses, viendo a ver como yo recuperaba también la confianza de que no me fueran a

---

[24] *Véase*, pág. 111, líneas 8-14 de la transcripción de la prueba oral.
[25] *Véase*, pág. 111, líneas 15-19 de la transcripción de la prueba oral.

hacer lo mismo, para poder comprar una propiedad".[26] Igualmente manifestó: "Y mi psicóloga es la que me va ayudando poco a poco, por todo este tiempo, para que yo pueda adquirir otra propiedad y yo pueda salir del revolú que él me había creado en toda esta situación".[27]

Finalmente, al resumir el impacto que los hechos tuvieron en su vida, expresó: "Fueron unos momentos de mucho estrés. Estoy en una propiedad más cerca. No es la propiedad que quería. Tengo que guiar ahora más para ir al trabajo. Fueron muchas las cosas que pasaron. Fue mucho".[28]

Al evaluar dicho testimonio, el TPI tuvo la oportunidad de observar directamente el comportamiento de la testigo, escuchar sus respuestas y aquilatar su credibilidad. Conforme a la deferencia que merecen las determinaciones de credibilidad del TPI, concluimos que la prueba presentada sí demostró la existencia de daños morales y angustias mentales previsibles como consecuencia del incumplimiento contractual.

Corresponde entonces determinar una cuantía razonable. Conforme a la normativa expuesta en *Herrera, Rivera v. SLG Ramírez-Vicéns*, supra; *Santiago Montañez v. Fresenius Medical*, supra y *Sucn. Mena Pamias et al. v. Meléndez et al.*, supra, la valoración de daños requiere considerar casos comparables y, además, las circunstancias particulares del caso ante nuestra consideración.

En cuanto a la cuantificación de dichos daños, tomamos como punto de referencia la compensación concedida en *Pereira v. I.B.E.C.*, 95 DPR 28 (1967), caso en el cual nuestro Tribunal Supremo confirmó una compensación máxima de $2,500.00 por

---

[26] *Véase*, pág. 118, líneas 15-19 de la transcripción de la prueba oral.
[27] *Véase*, pág. 118, líneas 20-24 de la transcripción de la prueba oral.
[28] *Véase*, pág. 119, líneas 10-14 de la transcripción de la prueba oral.

concepto de daños morales derivados de un incumplimiento contractual que afectó los derechos del demandante sobre una propiedad. Entendemos que dicho precedente constituye una referencia útil por tratarse igualmente de una reclamación de daños emocionales surgida en el contexto de una controversia contractual relacionada con derechos sobre un inmueble.

Conforme a la metodología de actualización reconocida por nuestro Tribunal Supremo, procede ajustar dicha cuantía a valor presente utilizando el Índice de Precios al Consumidor y el poder adquisitivo del dólar. Surge que para el año 1967 el Índice de Precios al Consumidor era de 25.39, lo que equivalía a un poder adquisitivo del dólar de $3.94.[29] Consecuentemente, la compensación de $2,500.00 concedida en *Pereira v. I.B.E.C.*, supra, equivale a una cuantía ajustada de aproximadamente $9,850.00.[30] Por otro lado, al momento de dictarse la *Sentencia* apelada en el presente caso, el poder adquisitivo del dólar era aproximadamente $0.72. Al actualizar dicha cuantía a valor presente, obtenemos una compensación equivalente de aproximadamente $13,680.56.[31]

Ahora bien, como ha reiterado nuestro Tribunal Supremo, el proceso de valoración de daños no puede descansar exclusivamente en un cálculo matemático, sino que requiere además considerar las circunstancias particulares del caso. *Sucn. Mena Pamias et al. v. Meléndez et al.*, supra, págs. 770-771. En este caso, la apelada demostró que el incumplimiento contractual frustró la adquisición de la residencia que esperaba ocupar, la colocó en una situación de incertidumbre respecto a su vivienda, le provocó sentimientos de estrés, frustración, desconfianza y desesperación, y la llevó a recibir tratamiento psicológico durante varios meses para poder recuperar

---

[29] 100/25.39
[30] 2,500.00 x 3.94
[31] 9,850/0.72

la confianza necesaria para adquirir otra propiedad. No obstante, aunque la prueba presentada fue suficiente para demostrar la existencia de daños emocionales y angustias mentales, la cuantía de la compensación debe guardar proporción con la naturaleza y alcance de los sufrimientos acreditados en autos.

Por ello, tomando en consideración la totalidad de las circunstancias acreditadas en autos, la naturaleza del incumplimiento contractual, el sufrimiento emocional demostrado mediante la prueba testifical y la necesidad de mantener una proporción razonable entre los daños probados y la compensación concedida, concluimos que una indemnización de $10,000.00 representa una valoración justa, razonable y adecuada de los daños morales y angustias mentales sufridos por la apelada. En consecuencia, modificamos la Sentencia apelada para reducir la partida de $82,174.00 a la suma de $10,000.00 por concepto de daños emocionales y angustias mentales.

En virtud de lo antes expuesto, procede modificar la *Sentencia* para eliminar la partida de $50,000.00 concedida por concepto de lucro cesante y sustituir la partida de $82,174.00 por una compensación de $10,000.00 por concepto de daños morales y angustias mentales. Así modificada, se confirma la Sentencia apelada.

## IV.

Por los fundamentos antes expuestos, se modifica la *Sentencia* apelada para eliminar la partida de $50,000.00 concedida por concepto de lucro cesante y reducir la partida de daños a la suma de $10,000.00 por concepto de daños morales y angustias mentales. Así modificada, se confirma la *Sentencia* apelada.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


                              Lcda.  Lilia M. Oquendo Solís
                        Secretaria del Tribunal de Apelaciones